E-FILED
Wednesday, 12 April, 2006  02:12:39 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| TRACEY D. HUSTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-1146 |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal [# 11] is DENIED, and the Commissioner's Motion to Affirm [#13] is GRANTED.

**BACKGROUND**

Plaintiff, Tracey Huston ("Huston"), was 45 years' old at the time of his administrative hearing; he is 5'8" tall and weighs 168 pounds. (R246, R249) He is married with one minor child and has a high school education plus a year and a half of cosmetology school. (R249-50) In the past, Huston has been employed as a hairdresser, and was employed in that capacity prior to stopping work in May 2003. (R246-47, R250)

On June 20, 2003, Huston applied for disability insurance benefits ("DIB"), alleging disability due to an injury to his knee and arthritis in both his knee and hands that began on July 17, 2000. (R72-78) His application was denied both initially and on

reconsideration. (R25-26) On December 9, 2003, Huston requested a hearing before an administrative law judge ("ALJ"). (R39) A hearing was held before ALJ Charles Reite on June 9, 2004, at which Huston, who was represented by counsel, and vocational expert ("VE") Robert Raschke appeared and gave testimony. (R17)

Huston testified that following a motorcycle accident, he had a crushed tibia plateau, which required the surgical insertion of pins and screws into his right leg. (R251) This injury still causes him chronic pain and swelling from his knee to his ankle. The pain worsens as the day progresses toward evening and requires him to elevate his leg for a half hour to an hour at least four times a day. (R251-52, R256) His right leg is bowing despite his attempted use of braces to provide support and is now an inch and a half shorter than it used to be. (R253) His foot turns under, causing him to fall, and his other knee and hip have gotten weak from trying to compensate. (R252) Huston stated that his left knee now comes out of joint when he tries to walk on it and that he also has problems with his lower back and hips. (R254) He takes Darvocet to help with the pain. (R257) Huston further testified that he has arthritis pain and swelling in his hands and elbows. Id. His doctor has prescribed amitriptyline for this pain, but the medicine makes him sleepy and sometimes makes it difficult for him to urinate. (R258)

Huston is able to drive well in a car with an automatic transmission, but he has problems when he tries to drive a car with a manual transmission. (R259) However, he needs to stop and stretch his legs after about a half hour. Id. He can no longer hunt, fish, or garden. (R260) Huston does the cooking for the household. He wears slip-on shoes and sits down to put his pants on but sometimes need assistance to finish dressing. Id. He does not have a shower, so he has to bend his legs to get into the bathtub and needs

help getting out of the tub after his bath. (R261) He stated that he cannot sleep through the night, wakes up approximately every hour, and cannot lay down for more than six hours at a time. Id.

Huston gets up by 5:00 a.m. (R262) He watches TV, spends time with his pets, cooks, and listens to music. Id. He can stand for about 20 minutes at a time and can walk approximately 100 yards before getting winded. Id. Huston has difficulty carrying things because of the weakness and instability in his legs and cannot stoop but is able to bend from the waist. Id.

The ALJ presented the VE with the following hypothetical:

> I'm going to give you a hypothetical individual, and we'll assume the same age, education, background, and experience as Mr. Huston. We'll assume for purposes of at least the upper extremities they'd be able to do light exertional work but with limited, very limited, walking and standing. In other words less than two hours of walking and standing in a workday. There would be a need for ability to sit and stand more or less as needed. Postural limitations would be stooping he could only do up to frequently. In other words not continuously or constantly. All of the other postural situations would only be occasional during the day and also – well just leaving it at that would the hypothetical individual be able to do any of the past relevant work?

(R271) VE Raschke testified that this hypothetical individual could not perform the past relevant work of a hairdresser because of his inability to remain on his feet for as much as eight hours per day. Id. With respect to other work that might exist in the economy, the VE testified that there are literally millions of sit/stand light/sedentary jobs in a variety of different areas that the hypothetical person could do. (R272) For example, in the general assembly field, there are about 160,000 light and sedentary jobs in the national economy and approximately 1200 jobs in the region as shade assemblers. Id.

The ALJ then presented a second hypothetical that included everything in the first hypothetical with the addition of "the necessity to elevate one of the legs, the right leg I guess, occasionally during the day, maybe a couple of times during the day, for up to half-an-hour at a time, a half-hour or 45 minutes, at a time." (R273) The VE opined that the additional conditions would eliminate the hypothetical individual's ability to do the light jobs in the general assembly field but that he would remain capable of performing the sedentary positions, which would be relatively easy to modify to allow him to elevate his feet. Id.

In a third hypothetical, the ALJ included everything in the first hypothetical but also assumed that the hypothetical individual "would have to either elevate or recline, elevate the right leg or recline, up to three to four times during the day for up to an hour each time." (R273-74) The VE responded that if the individual truly needed to recline, he would be unable to perform any work at all. (R274) If the need was actually to elevate the leg (i.e., putting it up on a chair level and maintaining a seated position) for that period of time, the limitation could easily be accommodated in the sedentary positions in the general assembly field. Id.

Finally, the ALJ presented a fourth hypothetical in which everything in the third hypothetical was assumed. In addition, the ALJ specified:

> [W]e'll add also to that that there'd be up to a moderate level of interference with concentration, pace, and persistence based on pain or pain medication, and assuming that – by moderate I would mean up to 2/3 of the day with the – or I'd actually rephrase that a little bit. Only operating at about 66 percent of the industry standard. The worker's concentration, pace, and persistence for throughout the day up to – in other words being but 1/3 low of concentration, pace, and persistence.

(R275) The VE then responded that once an individual gets beyond a 15% deficit, there is no labor base, and he would consider the individual to be unemployable.

On September 24, 2004, the ALJ issued his decision. (R14) The ALJ found that Huston's right lower extremity fracture and surgery is a "severe" impairment based on the requirements in the Regulations. (R23) The ALJ determined, however, that Huston does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. Id. After considering the medical evidence in the record and relevant credibility factors, the ALJ found the degree of Huston's alleged limitations to be not fully credible or substantiated by the record. Id. The ALJ determined that Huston had the following residual functional capacity:

> [U]pper extremity light work with very limited walk/stand (less than 2 hours); needs at will sit/stand option; stoop frequently; occasionally climb, balance, kneel, crouch and crawl; and, needs to elevate right leg occasionally each day 2 times for 30-45 minutes a time.

Id. After determining that Huston would not be able to perform his past relevant work as a hairdresser, the ALJ decided the case at step five after finding that he retained the residual functional capacity to perform a significant range of sedentary work, for which there were 1,200 such jobs in the regional economy and 160,000 such jobs in the national economy. Id. Based on a demonstrated exertional capacity for a significant range of sedentary work, Huston's age, education, and work experience, the ALJ concluded that Huston was not under a disability as defined in the Social Security Act (the "Act"). (R24)

Huston submitted a Request for Review of Hearing Decision. (R9) On April 15, 2005, the Appeals Council declined review of his claim, and the ALJ's decision became the

final decision of the Commissioner. (R5-7) This appeal followed. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In his appeal, Huston's pleadings raise essentially one claim: that the ALJ's decision finding him able to perform a significant number of jobs in the national economy was not supported by substantial evidence. The Court disagrees and finds that the ALJ's finding

that Huston has the residual functional capacity to perform the physical exertion and nonexertional requirements of a significant range of sedentary work, with very limited standing and walking, allowing him to sit or stand as needed, with certain other limitations is supported by substantial evidence.

Huston first argues that the ALJ failed to give appropriate weight to his testimony regarding his limitations. Specifically, he argues that the ALJ discounted his testimony that he is required to elevate his leg for 30 minutes to an hour four times a day and that at night, he must keep his leg elevated 12 inches above his body. In doing so, he suggests that the ALJ failed to adequately develop the record, as he should have ordered further medical tests or reports from the treating physician if he felt that Huston's testimony was not sufficient on this issue.

The ALJ considered medical evidence establishing that on July 17, 2000, Huston was involved in a motorcycle accident in which he suffered a fracture of his right tibia. On July 20, 2000, Dr. Marc Zussman performed surgery on the fracture that involved pinning and application of an external fixator. In August 2000, x-rays showed good alignment of the fracture, and Dr. Zussman felt that Huston was doing well and was able to flex and extend his knee well. The fixator and screws were removed on October 23, 2000, at which time Dr. Zussman noted no problems when the knee was put through a range of motion.

On April 4, 2001, Huston fell in his yard and reinjured his right leg. His right knee was swollen and painful to palpation; however, his patella seemed stable. He was prescribed Vioxx/Bextra for the inflammation and Vicodin for occasional relief of pain. Huston continued to complain of pain in his right knee, and in December of 2002 he was

told that his leg was bowing and that his only definitive option was to have a knee replacement. He was also given a prescription for Darvocet for his pain.

In May 2003, Huston requested a temporary increase in the frequency of his Darvocet because he had been mushroom hunting and rototilling. In July 2003, he was evaluated by Dr. Philip Budzenski, a consultative medical examiner. Dr. Budzenski observed that he walked with a slightly unsteady antalgic gait favoring his right leg. Although his gait was slightly unsteady, it was not lurching or unpredictable. Huston could get on and off of the exam table without difficulty and could bend over to put on his shoes. Examination of the right knee revealed moderate to marked tenderness to palpation and marked laxity in the infrapatellar area. Bilaterally there was no crepitus, redness, excessive warmth, swelling, effusion, or nodules. The knees extended to zero degrees and flexion on the right was limited to 105 degrees due to pain. Huston could minimally stand on his right leg but had no difficulty standing on his left leg. Dr. Budzenski concluded that Huston had decreased ability to ambulate but had full use of both his upper extremities and his left lower extremity.

In August 2003, Huston's physical residual functional capacity ("RFC") was assessed by Dr. Stanley Burris. Dr. Burris found that he could lift or carry up to 20 pounds occasionally and up to 10 pounds frequently. He could stand/walk or sit for about six hours in an eight-hour workday with normal breaks and was unlimited in his ability to push and pull. While he could climb ladders/ropes/scaffolds only occasionally, he could climb ramps/stairs, balance, stoop, kneel, crouch, and crawl frequently. Thus, Dr. Burris concluded that Huston was capable of performing light work with no limitations except that

he could only occasionally climb ladders/ropes/scaffolds.  This conclusion was affirmed by Dr. Sandra Bilinsky on October 31, 2003.

During a mental status evaluation on September 27, 2003, Huston indicated that cooks all of the meals and is generally able to care for himself, although he must sit to get dressed and bathe.  He stated that he uses the riding lawn mower, drives himself, and is able to manage money and pay the bills.  He described a typical day as getting up at 7:00 a.m., feeding the dogs, and fixing breakfast.  Three days a week, he would drive his wife to work and pick her up.  After watching television for a couple of hours, Huston would work on canning for his wife, sit outside, or work on the mower.  He then does the dishes and prepares dinner for his wife.  After dinner, he and his wife often watch a movie.  Huston often goes to bed at 9:00 p.m., awakens around midnight, remains up for two hours, and then tries to return to sleep.  The examiner concluded that Huston had an average to high level of intelligence and was psychologically and intellectually capable of doing simple assembly and considerably more complex work tasks under a normal amount of supervision.  Although the stress from the chronic pain and physical limitations could limit his ability to consistently cope with customary work pressures and demands, the examiner found that he was capable of comprehending, retaining, and recalling moderately complex and detailed work instructions.  Finally, his periods of discouragement and frustration, as well as fatigue and low energy due to sleep problems, did not take the form of a discrete depressive syndrome.

In October 2003, another reviewing psychologist found that Huston's depressive disorder was not severe and that he had only a mild degree of limitation in activities of daily

living, maintaining social functioning, and maintaining concentration, persistence, or pace. He had no limitation with respect to episodes of decompensation of extended duration.

The ALJ credited the medical opinions of Dr. Zussman and Dr. Budzenski based on the length, nature, and extent of the treating relationship, supportability with medical signs and laboratory findings, consistency with the record, area of specialization, and new evidence obtained after Dr. Burris rendered his opinion. That being said, the ALJ generally credited Dr. Burris' assessment limiting Huston to light work with frequent postural limitations, but concluded that he was actually more limited to a significant range of sedentary work because he could only stand/walk less than two hours and had occasional postural limitations.

The ALJ found Huston's statements regarding his symptoms and limitations to be generally credible, but not to the extent alleged because there had been no RFC assessment made by any qualified treating physician that limited him to the degree asserted. Based on post-surgery evidence, such as mushroom hunting, rototilling, yardwork, and caring for five pets, the ALJ concluded that Huston had a greater capacity than he acknowledged. The ALJ acknowledged mild restriction in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no evidence of decompensation. Accordingly, he concluded that Huston's depression was a non-severe impairment.

Based on these findings, the ALJ found that Huston retained the RFC to perform "upper extremity light work with very limited walk/stand (less than 2 hours); needs at will sit/stand option; stoop frequently; occasionally climb, balance, kneel, crouch and crawl; and, needs to elevate right leg occasionally each day 2 times for 30-45 minutes a time."

Crediting the VE's testimony that Huston could not perform his past relevant work but was capable of making a successful adjustment to other work, the ALJ then considered his age, education, transferrable skills, RFC, and the VE's opinion in concluding that Huston was capable of a significant range of sedentary work exiting in significant numbers in the national economy.

Contrary to Huston's argument, the ALJ did consider his testimony that he needed to elevate his leg periodically throughout the day. The VE's testimony clearly indicated that the sedentary positions that he had identified were easily modified to accommodate his need to elevate his leg up to three or four times during the day for up to an hour each time. The testimony that the ALJ discounted was Huston's alleged need to recline while elevating his leg, a restriction for which there was no supporting medical evidence in the record.

Huston also contends that the ALJ failed to consider the combined effects of his multiple impairments, the combination of which render him disabled. However, in the beginning of his decision, the ALJ clearly noted Huston's claim that he suffered from arthritis in both hands, as well as fatigue and hip pain. Beyond that, the ALJ discussed the objective medical evidence of record. Notably absent from the medical evidence is any indication that he has received specific treatment for these conditions or that they cause any loss in his functional capacity. To the contrary, the medical evidence of record indicated that Huston had full use of his bilateral upper extremities and was able to fully close all fingers in a fist, pick up coins, and button clothing. There was normal flexion and extension of individual digits bilaterally, no erythema, warmth, or swelling bilaterally, and normal grip strength bilaterally. Examination of his hips revealed a leg-length discrepancy, but no tenderness or atrophy and normal flexion, extension, abduction, and adduction;

internal rotation was preserved to 40 degrees while external rotation was preserved to 50 degrees bilaterally.

The record indicates that in considering Huston's RFC, the ALJ gave full consideration to the medical evidence of record and fully considered his subjective complaints of pain and credited them to a large extent as far as they were consistent with objective evidence in the record. It is well-settled that "[a]n ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Such credibility determinations may not be overturned by this Court unless they are patently wrong. Herr v. Sullivan, 912 F.2d 178, 182 (7th Cir. 1990). In reaching the conclusion that Huston's testimony was not fully credible regarding his ability to perform a significant range of sedentary work, the ALJ relied on the following facts: no physician of record has found that he is limited to the degree claimed, and more than one physician determined that he was capable of performing light work, which is a heavier exertional requirement than that found by the ALJ; the record contains no RFC assessment limiting him to the degree asserted; and treating notes from post-surgery evaluations reveal activity that indicates a greater capacity than he acknowledges. The record also indicates that he engages in some average daily activities, largely takes care of his own personal needs, and significant factors such as problems concentrating appear to be absent. After a review of the entire record, this Court finds that the ALJ's credibility determination was not patently wrong but was, in fact, reasonable.

Huston has the burden of demonstrating that he is disabled and providing medical evidence in support of his claim. Scheck v. Barnhart, 357 F.3d 697, 702 (7th

Cir. 2004). Here, the record contains no medical evidence that is inconsistent with the ALJ's findings. This is not a case where medical records were insufficient or incomplete, which could necessitate further development of the record. Rather, the medical records simply failed to compel the conclusion that Huston is disabled within the meaning of the Act. Accordingly, the Court must conclude that the ALJ's determination was supported by substantial evidence.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#11] is DENIED, and the Commissioner's Motion to Affirm [#13] is GRANTED. This matter is now TERMINATED.

ENTERED this 12th day of April, 2006.

                                  s/ Michael M. Mihm
                                  Michael M. Mihm
                                  United States District Judge